James H. Power
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone: (212) 513-3200
Telefax: (212) 385-9010
E-mail: james.power@hklaw.com

Attorneys for Petitioner,
GLORY WEALTH SHIPPING PTE LTD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GLORY WEALTH SHIPPING PTE LTD.,

                      Petitioner

       -against-

FLAME S A.

                  Respondent

13-

**VERIFIED PETITION TO RECOGNIZE AND CONFIRM AWARD OF ARBITRATION**

---

Petitioner, Glory Wealth Shipping Pte Ltd., (**"Glory Wealth"**), by and through its attorneys, Holland & Knight LLP, for its verified petition against Flame S.A. (**"Flame"** or **"Respondent"**), alleges, upon information and belief, as follows:

## JURISDICTION AND VENUE

1      This is a case of admiralty and maritime jurisdiction as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and as such subject exists pursuant to 28 U.S.C. § 1333.

2.      Subject matter jurisdiction also exists pursuant to 28 U.S.C. § 1331 as the action arises under the enacting legislation for the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), 9 U.S.C. § 201, *et seq.* and the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*

3.      Venue is proper in this District pursuant to 9 U.S.C. § 204 since, save for the underlying arbitration agreement clause, an action or proceeding with respect to the controversy between the parties could have been brought in this District;

4.      In addition, respondent Flame is subject to personal jurisdiction in this District because it registered to do business as a foreign corporation in New York in 2008 remains so at the time of this Petition.

5.      Petitioner brings this action seeking an order recognizing, confirming and enforcing the Final Arbitration Award obtained by Glory Wealth against Flame in the principal amount of $5,426,608.80, plus interest (the "Award") which has accrued in accordance with the Award as detailed below .  A true and correct copy of the Award is attached hereto as Exhibit 1.

6.      At all times material herein, Glory Wealth is and was a business entity organized and existing under the laws of Singapore having an address at 9 Temasek Boulevard 07-00, Suntec City Tower 2, Singapore 038989, Singapore.

7.      At all times material herein, defendant Flame is, and was, a foreign corporation or business entity organized and existing under the laws of the Switzerland and   upon information and belief at all material times herein, maintained a principal place of business in Switzerland.

## GLORY WEALTH'S CLAIM AGAINST FLAME

8.      On or about August 19, 2008, Flame as charterer and Glory Wealth as owner, entered into a multi-year contract of affreightment pursuant to a fixture recap and AmWelch charter form (collectively the "**COA**").

9.      Under the terms of the COA, Flame was obligated to nominate six cargoes for Glory Wealth for each of the years 2009-2012. Flame failed to nominate the 5th and 6th shipments for 2009, and any shipments for 2010, at which point Flame repudiated the COA, causing Glory Wealth further damages.

10.      The COA provided that disputes were to be resolved in London Arbitration pursuant to English law.  Glory Wealth commenced arbitration in London pursuant to the terms of the COA.  Flame fully participated in the lengthy and fact-intensive arbitration via counsel.  In particular, Flame offered the defense that Glory Wealth had committed an anticipatory repudiation because it could not, at the time of the missed nominations, have performed its duties.

11.      In its reasoned decision and Final Interim Award, the London arbitration panel rejected Flame's arguments and awarded Glory Wealth $1,381,384.60 in damages arising from the two missed cargo nominations in 2009, with 5% interest, compounded quarterly, accruing from February, 2010; and $4,045,224.00 in damages arising from the six missed shipments in 2010, with 5% interest, compounded quarterly, accruing from August 2010.

12.      As such, Glory Wealth is currently owed $6,465,362.36 pursuant to the Award. Which is the sum of $1,676,213.36 (representing compound quarterly interest of 5% on $1,381,384.60 from February 1, 2010 through December 23, 2013) and $4,789,149 (representing

3

compound quarterly interest of 5% on $4,045,224.00 from August 1, 2010 through December 23, 2013).

13.     The London Arbitration Panel had jurisdiction to issue the Award.  The Award is final and enforceable and not subject to any appeal.

14.     Under English law the Award is binding on the parties.

15.     The Petition is timely since it was filed within 3 years of the date of the Award.

16.     Respondent Flame S.A. cannot in good faith raise any of the delineated reasons under the New York Convention for non-recognition of the Award.

**WHEREFORE,** upon this Verified Petition, Glory Wealth respectfully prays that this Court enter an Order confirming the Award and direct that a judgment be entered in favor of Petitioner against Respondent **$6,465,362.36**.

Dated: December 23, 2013

**HOLLAND & KNIGHT LLP**

By:  _____

James H. Power
31 West 52nd Street
New York, NY 10019
Tel:    (212) 513-3200
Fax:    (212) 385-9010

Email: james.power@hklaw.com

## VERIFICATION

STATE OF NEW YORK              )

                                                     :ss.:

COUNTY OF NEW YORK       )

James H. Power, being duly sworn, deposes and says:

I am an attorney with the firm of Holland & Knight LLP, counsel for Glory Wealth Shipping Pte Ltd. ("Glory Wealth"), plaintiff in the foregoing action. I have read the foregoing Verified Petition and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Glory Wealth and my firm has corresponded with Glory Wealth's representatives regarding this matter. I am authorized by Glory Wealth to make this verification, and the reason for my making it as opposed to an officer or director of Glory Wealth is that there are none within the jurisdiction of this Honorable Court.

                                              _____
                                                          James H. Power

Sworn to before me this
**23** rd Day of December 2013

_____
Notary Public

GLENN M. HUZINEC
Notary Public, State of New York
No. 01HU4873127
Qualified in Richmond County
Certified in New York County
Commission Expires October 6, 2014

#26896395_v1

5

# Exhibit 1

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION

B E T W E E N

### GLORY WEALTH SHIPPING PTE LTD

Claimant/Owners

- and –

### FLAME S.A.

Respondent/Charterers

### COA dated 19th August 2008
### (5th & 6th shipments in 2009 and 1st to 6th shipments in 2010)

---

# I N T E R I M
# F I N A L   A W A R D

---

**WHEREAS:**

1.      By a contract of affreightment dated 19th August 2008 (the COA), in each of the years 2009, 2010 and 2011, the claimant owners (the Owners or Glory Wealth) agreed to carry and the respondent charterers (the Charterers or Flame) agreed to ship 6 cargoes of coal in bulk.

2.      The COA provided for disputes to be resolved by arbitration in London according to English law.   The fixture re-cap dated 19th August 2008 stated: "*GA/ARBITRATION IN LONDON, ENGLISH LAW TO APPLY*" and clause 5 of the Charterers' pro-forma 'Amwelsh' charter-party by reference to which the parties agreed the COA, provided as follows:

1

"*If any dispute or difference should arise under this Charter, same to be referred to three parties in the City of London, in accordance with UK LAW...English Law to apply, one to be appointed by each of the parties hereto, the third by the two so chosen, and their decision, or that of any two of them, shall be final and binding, and this agreement may for enforcing the same, be made a rule of Court.  Said three parties to be commercial men conversant with shipping matters*".

3.      Disputes arose between the parties.   The Owners appointed me the undersigned Timothy Marshall then of Global House, 61 Petty France, London SW1H 9EU and now of 27 Waldemar Avenue, London SW6 5LB, the Charterers appointed me the undersigned Sonja Fink of 48 Werter Road, Putney, London SW15 2LJ and on 25th October 2011 Timothy Marshall and Sonja Fink appointed me the undersigned Richard Rayfield of High Riding, Corbridge, Northumberland NE45 5EJ to be the third arbitrator.   Richard Rayfield was appointed in respect of the disputes that had arisen regarding the 5th and 6th shipments in 2009 and regarding the 1st to 6th shipments in 2010.  Subsequently, on 6th July 2012 Timothy Marshall and Sonja Fink appointed Richard Rayfield for all disputes arising under, out of or in connection with the COA.  All the appointments were subject to the 2006 terms of the London Maritime Arbitrators' Association (the Terms) and by virtue of paragraph 5 of the Terms, they apply to this reference.  The seat of the arbitration is London, England.

4.      On 25th November 2009, Timothy Marshall and Sonja Fink published an award (the First Award), the subject-matter of which was a dispute arising out of the failure of the Charterers to pay freight in respect of the 4th shipment in 2009, carried by the m.v. Ocean Crystal.  By the First Award (i) they expressly did not deal with the issue of whether the COA included the expression "*GLORYWEALTH TONNAGE TBN*" and its meaning[1] and (ii) they awarded the Owners freight of US$2,076,612.75.

5.      Broadly, the disputes with which this award deals arose out of the Charterers' failure, allegedly in breach of contract, to declare laycans for the 5th & 6th shipments of 2009 and for all 6 shipments in 2010[2].  The Owners claimed damages.  On the grounds explained in detail below, the Charterers resisted the Owners' claims.

---

[1] Now dealt with below in this award.

[2] In addition, the Charterers did not declare laycans for any of the 6 shipments in 2011 but claims arising out of that year's shipments (for which we reserve our jurisdiction) were deferred to be dealt with later as may be necessary.

2

6.       The Owners were represented by solicitors Holman Fenwick Willan of Hong Kong and the Charterers were represented by solicitors in London, Thomas Cooper.  The matters dealt with in this award were the subject of an oral hearing that took place between 31st July and 2nd August 2012 inclusive at the International Dispute Resolution Centre, 70 Fleet Street, London, EC4Y 1EU.  The proceedings included the parties' written submissions and relevant supporting documents, disclosure of documents, written and oral evidence from witnesses of fact and written expert evidence.  Each party's case was presented to us by leading counsel.

7.       **NOW WE**, Richard Rayfield, Timothy Marshall and Sonja Fink, having taken upon ourselves the burden of this reference and having carefully and conscientiously considered the parties' submissions and the evidence, both written and oral, and having given due weight thereto and, for the reasons forming part of this award, finding ourselves in agreement, **DO HEREBY MAKE, ISSUE AND PUBLISH** this our **FINAL ARBITRATION AWARD** as follows:

> A.       WE FIND AND HOLD that the Owners' claim for damages succeeds in the amount of US$5,426,608.60 (five million four hundred and twenty six thousand six hundred and eight United States dollars and sixty cents) and no more.

> B.       WE ORDER AND DIRECT that the Charterers shall forthwith pay to the Owners the said US$5,426,608.60

> C.       WE ORDER AND DIRECT that on the amount payable under paragraph B above, the Charterers shall pay to the Owners interest at the annual rate of 5 per cent compounded at three-monthly rests until the date of payment, such interest to be calculated for the periods set out in the next following paragraph.

> D.       On the amount of US$1,381,384.60 due in respect of the 5th & 6th shipments, the interest shall be payable for the period from 1st February 2010 until the date of payment and on the amount of US$4,045,224.00 due in respect of the 6 shipments in 2010, the interest shall be payable from 1st August 2010 until the date of payment.

3

E.      WE RESERVE all questions of costs for further argument, including liability for our own costs of this award.

F.      WE DECLARE that this award is final as to all matters determined in it and we reserve to ourselves jurisdiction to hear and determine all other issues and matters which have arisen or which may arise out of this reference including but not limited to disputes arising out of the COA in respect of the shipments due to be made in 2011 and the power to make such further award or awards in relation thereto as may be appropriate.

Dated the ................14ᵗʰ.................. day of ........December........ 2012

_____          _____
Richard Rayfield                 Witness

_____          
Timothy Marshall                 Witness

_____          _____
Sonja Fink                       Witness

4

# REASONS

Glory Wealth Shipping Pte Ltd ~ and ~ Flame S.A.

Contract of Affreightment 19th August 2008

**Introduction**

1.      In 2008, the claimant owner, Glory Wealth Shipping Pte Ltd, was a private company registered in Singapore.   According to the evidence presented to us, the company was incorporated in 2007 and carried on business in the international dry bulk shipping trades, its principal business being the chartering (including on period time charters) and sub-letting of ships for the purpose of carrying bulk commodities.   Part of the company's business was conducted by means of contracts of affreightment which were intended to ensure a stable source of cargoes.   In the words of Mr Xu Shenguo, one of its directors, in an affidavit sworn in proceedings in the High Court of Singapore in support of an application made by Glory Wealth for a scheme of Compromise and Arrangement between Glory Wealth and its creditors, under section 210 of the Singapore Companies Act, "...*Between 2007 and 2008, GWS's Chartering Business boomed*..." and the company operated a fleet of more than 100 vessels.   Clearly, the Owners ran a substantial business which had become well-known in the shipping and commodity trades.

2.      We received written and oral evidence from Mr Luca Ferrari, a director of the respondent charterer, Flame S.A., to the effect that the Charterers' business was the international sourcing and supply of steaming coal, petroleum coke and metallurgical coke and again, it appears that in those trades and the associated shipping trades, it had become well-known and substantial.

3.      In the summer of 2008 after a sustained rise, the shipping market was buoyant and the Charterers were looking to conclude a COA whereby, over the succeeding 3 years to 2011, their shipping costs would be held and they would be protected from further unpredictable rises in the freight market.   A contract of affreightment also suited the Owners and after a negotiation via brokers Bancosta in Italy and its office in Beijing, the COA was agreed on 19th August 2008.

5

4       At about that time, the shipping market started to experience a slow decline but in about October 2008, it suffered a sudden collapse signalled in part by the collapse of Lehman Brothers but reflecting the rapid decline generally in the world economy   In his affidavit, Mr Xu Shenguo said that from 3,025 in October 2008, by December 2008 the Baltic Dry Cargo Index fell by more than 75% to 700   This dramatic fall meant that operators who had committed themselves to period time charters at high daily rates found it very difficult or impossible to employ their ships at anything other than a loss   The converse also applied – those providing cargoes who had committed themselves for long periods at or near the top of the market discovered that their customers, the shippers, were prepared to pay freight only at the much reduced market rate   We mention these developments in the economic circumstances in the second half of 2008 immediately after the COA had been concluded not only as background but also because they were referred to in the course of the hearing as possible influences on the attitudes of the parties

5       Even if their attitudes were affected by these changes in the economic climate, however, we do not believe that the parties' economic or commercial preferences and difficulties can be used to justify under their COA any particular decision that one or other of them took   It is necessary for us objectively to determine on the evidence (including evidence of the effect on the Owners and Charterers of the market turmoil created by the downturn) and as a matter of construction whether the COA did or did not entitle them to act as they did, irrespective of what may or may not have motivated them

**Summary of events and the Owners' claims**

6       Drawing in part on the Owners' outline opening submissions, we summarise the course of the COA and the Owners' claims   During each of the years 2009, 2010 and 2011, the Owners were obliged to carry and the Charterers were obliged to ship, load and discharge 6 cargoes of coal in bulk, with the shipments to be declared (in accordance with the recap) "  *fairly evenly spread*   "  We deal below with the meaning of that expression

7       Throughout 2009, disputes arose between the Owners and the Charterers, relating to the Charterers' failure and/or refusal to perform and/or to their delay in performing one or more of their contractual obligations   In the contemporaneous correspondence between the

6

parties, the Charterers expressed the view that because the fall in the shipping market had severely damaged the Owners' financial position, they (the Charterers) were concerned that the Owners would not be able to perform.[3]  In particular, they were concerned that ships chartered by the Owners and loaded with the Charterers' cargo (or more accurately their customers' cargo) would be arrested or otherwise detained with disastrous effects on the Charterers' business and reputation.

(a)  By reason of those concerns, the Charterers decided not to nominate laycans for the 1st and 2nd shipments.  Instead, on 9th June 2009 they signed a "washout" agreement whereby they paid the Owners a lump sum of US$2,100,000.

(b)  The Charterers delayed in declaring a laycan for the 3rd shipment (carried in the event by the m.v. "La Jolla"); they delayed in their acceptance of the vessel nominated by the Owners; they delayed in paying the 95% freight; and they failed and/or refused to pay deadfreight and demurrage.  It was only after claim submissions were served and a final and peremptory order made by the tribunal for service of a defence that, in May 2011, the Charterers paid the deadfreight and demurrage.

(c)  The Charterers delayed in declaring a laycan for the 4th shipment (carried in the event by the m.v. "Ocean Crystal"); when a laycan was declared, it was described as "conditional"; notwithstanding the carriage of this cargo, it was only after the First Award had been made against the Charterers and only after an unsuccessful application for leave to appeal that the Charterers paid the 95% freight.

8.    In accordance with the recap's nomination clause, the Charterers were obliged to declare each laycan with a 10 day spread at least 30 days prior to the commencement of the laydays.  Repeatedly, the Owners called upon the Charterers to declare laycans for the 5th and 6th shipments and with 21st November 2009 as the last permissible date for the Charterers to declare a laycan for performance within the 2009 calendar year[4], on 26th November 2009 the Owners accepted the Charterers' repudiation with respect to the 5th and 6th shipments.  We

---

[3] These are topics to which we return, below.

[4] As to which topic, see below.

find and hold that that acceptance brought to an end the Owners' obligations with respect to the 5th & 6th shipments.

9.    In relation to those 2 shipments, the Owners claimed damages for their alleged loss and damage in the sum of US$1,629,915 (being US$1,032,645 for the 5th shipment and US$597,270 for the 6th).

10.    In addition, in 2010 despite repeated requests and demands by the Owners, the Owners said that, in breach of contract, the Charterers failed and/or refused to declare laycans for any of the shipments scheduled for 2010.  As a result, the Owners alleged that the Charterers renounced or repudiated the COA in respect of all 6 shipments scheduled for the 2010 calendar year and they accepted the Charterers' breach in respect of all of those shipments.  For the 1st, 2nd, & 3rd shipments these were by fax messages from Holman Fenwick Willan to Thomas Cooper dated 11th March 2010, 13th August and 26th August 2010 respectively; for the 4th & 5th shipments this was by fax from Holman Fenwick Willan to Thomas Cooper dated 29th November 2010; and for the 6th shipment, this was by fax from Holman Fenwick Willan to Thomas Cooper dated 1st December 2010.  We find and hold that these acceptances brought to an end the Owners' obligations with respect to the 6 shipments due to be made in 2010.

11.    Arising out of the non-performance of the 2010 shipments, the Owners claimed damages amounting to US$4,754,295.

12.    Finally, the Owners allege similar breaches in respect of all 6 shipments scheduled for the 2011 calendar year.  Despite repeated requests and demands by the Owners, the Charterers failed and/or refused to declare laycans for any of the shipments scheduled for 2011 and the Owners accepted the Charterers' repudiation with respect to all of these shipments.  The Owners allege further loss and damage in respect of the 2011 shipments and claim damages in a sum to be assessed, but we ruled that the 2011 shipments would not be dealt with at the hearing or in this award.  In respect of those shipments as with all other matters not dealt with or not dealt with finally in this award, we reserve our jurisdiction.

13.    In essence, the Charterers' defence to these claims was to the effect that during the periods in question, as a result of the market's collapse the Owners' financial position had

8

deteriorated to such an extent that it was not the Charterers' who were in actual repudiatory breach of contract in failing to make declarations of laycan ranges at the appropriate times, rather, as a result of their financial incapacity, it was the Owners who were in anticipatory repudiatory breach by evincing an inability to perform the COA in accordance with its terms and the Charterers said they accepted that anticipatory repudiatory breach expressly and/or by their conduct in not declaring the laycan ranges

14      Alternatively, the Charterers said, even if it was they – i e the Charterers – who were in breach, the Owners had suffered no loss because, by reason of the Owners' poor financial position, even if the Charterers had declared the laycans, the Owners would not have been able to charter-in ships and thereby to provide vessels to carry the cargoes and earn the freights under the COA

**Liability**

15      The Charterers alleged that in respect of each shipment, the Owners were in anticipatory repudiatory breach of contract and that they (the Charterers) accepted that breach, thereby bringing to an end the parties' obligations for the shipment concerned   It was common ground between the parties that in order to succeed with the argument (that the Owners were in anticipatory repudiatory breach) the Charterers must demonstrate that they accepted such repudiation[5]   This question of the Charterers' acceptance is relevant only to liability and we shall deal with this aspect of liability first

16      In his opening, Mr Akka QC for the Owners succinctly summarised the position by saying that " *a party will be in breach giving rise to a right in the other party to terminate if he (1) won't perform, (2) can't perform, or (3) doesn't perform   The first two modes are (generally) anticipatory breaches   The third is an actual breach*"   If, as the Charterers alleged, the Owners were incapable of performing in the manner required by the terms of the COA (as to which, see below), then the Owners were in breach in the sense represented by mode (2)   In this case, therefore, the Charterers say that before the time for performance had

---

[5] In STC v Golodetz [1989] 2 Lloyd's Rep  277 at page 285, we were referred to the well-known statement of Asquith, LJ  in Howard v Pickford Tool Co , Ltd [1951] 1 K B  417 at page 421  " *An unaccepted repudiation is a thing writ in water and of no value to anybody, it confers no legal rights of any kind*  "

9

arrived, by their conduct and by reason of their financial incapacity the Owners had evinced an inability to perform the COA in accordance with its terms

17     The Charterers' case on acceptance was that (a) by their conduct in not nominating laycans and/or (b) by their e-mail via the brokers on 1st December 2009, the Charterers accepted the Owners' alleged repudiatory breach   In their message they said

*"We refer to your message 26/11 repeated below   We accept this message and earlier messages as a repudiation on your part of both the 5th and 6th shipments which we hereby accept thereby bringing any obligations which may be owed by us in respect of those shipments to an immediate end   We continue to reserve all our rights in respect of the COA and also your conduct in respect of the "LA JOLLA" and "OCEAN CRYSTAL" shipments"*

18     Dealing first with the message, the Owners' answer to that was that by the time the Charterers sent it on 1st December 2009, the Owners had already terminated in respect of the 5th & 6th shipments in accordance with their message dated 26th November 2009   By that message, the Owners said, in part

*"   despite the final opportunity given by Owners to Charterers to declare laycans for the 5th and 6th shipments, for which purpose time was made strictly of the essence, Charterers have failed to make their declarations, whether within time or at all*

*You should treat this message as Owners' acceptance of Charterers' repudiatory breach of their obligations to perform the 5th and 6th shipments for 2009 under the COA*

*For the avoidance of doubt, while all of Owners' rights are strictly reserved, the terms of the COA with respect to the parties  obligations to perform the future/balance shipments scheduled for 2010 and 2011 remain in full force and effect "*

19     As for the question of whether the conduct relied upon by the Charterers as amounting to a clear and unequivocal indication to the Owners that the Charterers regarded their obligations in relation to the 5th & 6th shipments to be at an end, the Owners said that, taken as a whole, the Charterers' conduct indicated the opposite

(a)   On 30th October 2009, the Charterers said  " *we are reluctant to nominate a 5th shipment at the present time   For now we must reserve all our rights under the COA  we will make further nominations but only after the 'OCEAN CRYSTAL' voyage is performed and there has been an expedited hearing of the dispute over the 'OCEAN CRYSTAL' freight    "*

10

(b) On 11th November 2009, the Charterers said *"We really have doubts about GW and we remain reluctant to nominate a 5th shipment at this time   We have made our position clear we have reserved all our rights under the COA and will make further nominations but only after the OCEAN CRYSTAL's voyage is performed and the dispute over the OCEAN CRYSTAL' freight has been resolved"*

20      In relation to 2010, the Charterers adopted a similar stance.

(a) On 24th March 2010, through their solicitors Thomas Cooper, the Charterers said: *"Our clients' position is and remains that the COA is in force and...they have reserved all their rights in respect thereof   Your clients continue to be the subject of multiple winding up petitions and to date have been unable and/or unwilling to demonstrate that they can perform the COA.  In the circumstances, Flame SA will not presently be making a nomination for the second shipment for 2010"*.

(b) On 18th August 2010, again via their solicitors, the Charterers said: *"Our clients' position is and remains the same as before   Flame SA will not presently be making a nomination for the third shipment for 2010"*.

(c) On 8th September 2010, Thomas Cooper wrote. *"...please be assured that our clients remain willing to perform their obligations under the COA as and when stability might return at GWS but they are not presently making a nomination"*.

21      For the reasons set out below, we have reached the conclusion that there was no acceptance by the Charterers on either basis, namely, (a) by their conduct in not declaring laycans or (b) by their e-mail dated 1st December 2009.  We find and hold accordingly  This means that even if, in anticipatory repudiatory breach of contract, the Owners were in fact incapable of performing the COA according to its terms, the absence of any effective acceptance by the Charterers means that such breach would have no legal effect.

22      Firstly, it is not disputed that, apart from those for the 3rd & 4th shipments in 2009, the Charterers did not declare the laycans for which the COA provides.  Therefore, unless they were contractually excused from making the declarations, and we find and hold that they were not, they were in breach of the COA and we agree with the Owners' submission that the

11

Charterers were in actual repudiatory breach.  In the absence of any such contractual excuse, the Owners' e-mail dated 26th November 2009 was effective to accept the Charterers' repudiatory breach and thereby to bring to an end the obligations in respect of the 5th & 6th shipments.  It follows from that, and we so find and hold, that the Charterers' purported acceptance of the Owners' alleged anticipatory repudiatory breach of contract came too late.

23.     Secondly, the Charterers argued that even if their 'acceptance' e-mail was too late, in not declaring the laycans they in fact accepted by conduct.  In this context, there was some discussion about the circumstances in which silence and/or non-performance can be interpreted and/or effective as an acceptance and we were referred to *The Santa Clara* [1996] 2 Lloyd's Rep. 225 (H.L.), a case involving acceptance by non-performance, in which Lord Steyn held at page 230: "*Sometimes in the world of businessmen an omission to act may be as pregnant with meaning as a positive declaration....a failure to perform may sometimes be given a colour by special circumstances and may only be explicable to a reasonable person in position of the repudiating party as an election to accept the repudiation.*"  Therefore, the House of Lords acknowledged that where there are special circumstances, to the reasonable person in the position of the repudiating party a failure to perform may be explicable only as an election to accept the repudiation.

24.     We are satisfied that that situation does not exist in this case.  Silence or non-performance is nearly always equivocal conduct, falling short of the required clear and unambiguous communication by the aggrieved party of its intention to treat the contract as at an end.  Although in not declaring laycans there was a failure to perform on the part of the Charterers, they did not in fact remain silent.  During both 2009 and 2010 there were positive communications from the Charterers which clearly and unequivocally communicated to the Owners that the Charterers were not electing to accept the Owners' conduct as a repudiatory breach so as to terminate their obligations.  We refer to the examples cited above at paragraphs 19 & 20.

**Damages**

25.     Having concluded that it was the Charterers who were in breach, we now turn to the question of whether the Owners are in principle entitled to damages and if so in what amount.  We approached this on the uncontroversial basis that an innocent party is entitled to be put

12

into the position that he would have occupied had the contract been performed. In determining this, as in relation to any other question of causation of loss, we decided the issue on the balance of probabilities. If, as we have decided, it was the Charterers who were in breach, in relation to ascertaining the loss suffered by the Owners, Mr Hancock QC for the Charterers posed a number of questions.

(a) What is the proper approach to adopt towards the assessment of damages in this case? In particular:-

(i)      Do the Owners have to show on the balance of probabilities that, but for the Charterers' breach, they would have performed their part of the contract?

(ii)     Do the Owners have to show merely that they have been deprived of the chance of performing their part of the contract, a chance which would then have to be evaluated?

(iii)    Do the Owners only have to show that they were not incapable of performing their part of the contract as at the date of the acceptance of repudiation?

(b) If the answer to (a) is (iii), what is the proper test of "incapability"?

(c) Applying whatever is the proper test, was the Claimant in fact capable of performing?

26.    The factual issue that is central to these questions is that of whether at the material times the Owners were or were not capable of performing the COA in accordance with its terms. Related to that factual issue are the legal questions of whether such ability or inability has to be proved and if so by which party. We shall return to both those topics in due course.

27.    Of considerable importance to the Charterers' case as to what the COA's terms required of the Owners, were their submissions that the COA included the term "*Glorywealth tonnage tbn*" which they said was a condition and which required the Owners to nominate vessels of which Glory Wealth Shipping Pte Ltd was either the owner or the disponent owner.[6]

---

[6] In the First Award, the tribunal did not decide those issues.

13

28.     Enlarging on this, Mr Hancock QC for the Charterers submitted as a general proposition that a disponent owner has control of a vessel which is at his disposition. Generally, control comes from the ownership of the vessel or from the contractual right to the services of the vessel derived from a time charter-party or a voyage charter-party (or in the case of part of a vessel, from a slot charter). He further submitted that control is not derived from a bill of lading contract which is an entirely different type of contract having three distinct functions unrelated to a right to receive the services of the ship concerned.

29.     The Owners denied that the COA contained any such term and so we begin by dealing with what was agreed in the contract. The contractual documents that were before us included some pre-fixture e-mails, the fixture re-cap dated 19th August 2008, and the Charterers' executed Cosco Eurobulk/Flame 'Amwelsh' voyage charter-party dated 3rd February 2006 by reference to which (as per the recap) the terms of the COA had been agreed. In addition, there was an unsigned COA on an 'Amwelsh' form that was drawn up by Bancosta approximately 6 months after the COA was agreed and after the parties' relationship had started to deteriorate early in 2009. The fixture recap was sent by Bancosta to the Owners and to the Charterers and among other items, it stated:

*"ref Glorywealth tonnage tbn/flame, cp date 19aug,2008*
*coal Indonesia/med*

---

*Confirming telconvs and exchanges we are pleased to recapitulate the clean*
*agreement reached today between messrs Glory Wealth Shipping PTE. LTD and*
*Messrs Flame S.A:*

*FIXTURE TO BE KEPT ABSOLUTELY P AND C*

*VSL TO BE BULK CARRIER S/D GRLS*
*MAX 20 YRS*
*VSL TO BE HIGHEST LLOYD'S CLASSED OR EQUIVALENT*
*VSL TO BE FULLY PANDI COVERED*
*VSL TO BE RIGHTSHIP APPROVED*

*OWNERS GUARANTEE VSL HAS ON BOARD ALL CERTIFICATES REQUIRED FOR*
*INTENDED TRADE INCLUDING A VALID ITWF BLUE CARD,*

*FOR*

*- ACC FLAME*
*...*

14

*SHIPMENT PERIOD 2009/2010/2011*

*NOMINATION CL:*
*CHARTRS TO NOMINATE LAYDAY/CANCELLING DAY WITH 10 DAYS SPREAD 30 DAYS*
*PRIOR TO EACH LAYDAY COMMENCEMENT.*
*WITHIN 14 DAYS BEFORE COMMENCEMENT OF LAYCAN GIVEN, OWNERS TO NARROW*
*LAYCAN TO A 7 DAYS SPREAD AND TO NOMINATE VSL OR SUB.*
*...*
*6 FIRM CGOS PER YEAR EACH OF 65000/10 PCT MOLOO BLK COAL*
*EVERY 6 SHIPMENTS TO BE DECLARED WITH FAIRLY EVENLY SPREAD EACH YEAR*
*...*
*DISCHARGE 1SB VADO WHERE CHRTRS ADVISE 41'6" DRFT WOG OR 1SB PORTO TORRES*
*OR 1SB PLOMIN OR 1SB KOPER OR 1SB PORTO TORRES + 1SB VADO LIGURE IN CHOPT...*
*...*
*FRT BSS LOADING NPLCT OR BALIKPAPAN OR IBT :*

|  |  |
|---|---|
| *DISCH VADO LIGURE :* | *USD36,00 PMT* |
| *PLOMIN :* | *USD 36,75 PMT* |
| *KOPER :* | *USD 35,00 PMT* |
| *P.TORRES + VADO LIGURE :* | *USD35,25 PMT* |

*...*
*OTHERWISE CHRTS EXECUTED COSCO EUROBULK/FLAME DULY AMENDED AS PER*
*ABOVE MAIN TERMS AND FLWD ALTERATIONS AGREED BETWEEN PARTIES. ."*

30.     For the Owners, it was pointed out that it was the fixture recap and not the unsigned
COA (on which the Charterers relied) that was the best evidence of the contract.   In the
fixture recap, the words "...*Glorywealth tonnage tbn...* " appeared only in the heading, not in
the body of the text that was in capital letters recording what had been agreed.   In other
words, the words in the heading were simply descriptive of the subject-matter of the e-mail
fixture recap and did not amount to a term of the COA.

31.     We agree with the Owners that, as between the fixture recap and the unsigned COA,
the recap is the more important document, being contemporaneous with the agreement of the
COA, and neither party suggested that the contents of the fixture recap did not reflect what
had been agreed.   Rather, the parties disagreed about how the fixture recap should be
interpreted.   The fixture recap concludes, however, by stating that the COA is otherwise as
per the "...*CHRTS EXECUTED COSCO EUROBULK/FLAME DULY AMENDED AS PER*
*ABOVE MAIN TERMS AND FLWD ALTERATIONS AGREED BETWEEN PARTIES*..."
emphasis added.   This had been alluded to in earlier recaps by the words: "*OWISE*
*FURTHER TERMS/DETAILS SUB REVIEW CHRTS' CP*".   Therefore, the recap must be
construed together with the Charterers' pro-forma charter-party.

15

32.     As a preliminary point regarding the proforma, on the 15th August 2008, the parties had reached a wide measure of agreement on the main terms.  On 18th August 2008, Mr Riccardo Scaletta at Bancosta in Genoa sent to Mr Kenny Wang at the Bancosta office in Beijing the Charterers' executed charter-party to which reference had been made previously – i.e. the proforma - with a request to "…*adv if any comments fm owns…*".  At 13:44 on 19th August 2008, Mr Wang replied to Mr Scaletta: "…*tks chrts executed cp, owner checked and only found fwld comment…*" and the subject-matter of that single comment was clause 31 dealing with notices at the port of loading.  This suggests to us that, apart from clause 31,  the Owners were content with and agreed to the contents of the proforma subject, of course, to any terms actually amended in the negotiations

33.     The pro-forma charter-party states in lines 1 & 2 that "*It is this day mutually agreed, BETWEEN Messrs. COSCO EUROPE GMBH, Hamburg Disponent Owners of the 'COSCO EUROBULK TO BE NOMINATED' Steamship / Motorship See clause 30…*"[7].  Additional clause 30, entitled "*Vessel's description*" began "*M/V COSCO EUROBULK TO BE NOMINATED*".  It seem to us to go without saying that although the upper case text of the recap does not deal specifically with lines 1 & 2 or with the opening words of clause 30, the parties must have intended that the preamble would be amended to read: "*It is this day mutually agreed, BETWEEN Messrs. GLORY WEALTH SHIPPING PTE LTD, Singapore Disponent Owners of the 'GLORY WEALTH TO BE NOMINATED' Steamship / Motorship See clause 30…*" and that clause 30 would begin "*M/V GLORY WEALTH TO BE NOMINATED*".

34.     That must be so in our view even though the scheme of the recap and proforma was that the proforma was to be amended in accordance with the main terms and other alterations agreed in the recap.  The only other alteration specified at the end of the recap related to clause 31.  It cannot have been the parties' intention, however, that references in the proforma to Cosco should remain unamended.  Alternatively, we regard the identity of the party which is to nominate the ships as a main term which must necessarily amend the COA.  We so find and hold.

---

[7] The text in bold represents the printed text of the 'Amwelsh' form.

16

35.    Because of their view of the effect of the recap's heading, the Charterers said that the amendments would actually have read (as eventually drawn up by Bancosta):

>    Lines 1-2: "*It is this day mutually agreed, BETWEEN Messrs GLORYWEALTH SHIPPING PTE LTD, SINGAPORE Disponent Owners of the "GLORYWEALTH TONNAGE TBN"...*"

>    "*30. Vessel's Description*
>    *M/V GLORYWEALTH TONNAGE TO BE NOMINATED...*"

The difference is the presence of the word "tonnage" and for the reasons below, we do not think the presence or absence of that word makes any difference.

36.    As stated in the recap, the COA was intended to be and was based on the 'Amwelsh' form.  Like any charter-party form, it makes provision for the insertion of the name of the ship that is to perform the voyage which is the subject-matter of the charter-party.  This is clear from the printed text of lines 1 & 2 of the preamble quoted above in which the first-named contracting party is described as the owner of the "XXX" steamship or motorship.  Where such a form is used as the basis of a contract of affreightment, it is not possible at the time of contracting to identify the ships that will carry the cargoes.  In place of what would normally be the name of the performing ship, therefore, what the parties (or the brokers) have done is simply to use a somewhat cryptic expression to indicate that in each case the performing ship is to be nominated by the Owners – i.e. by Glory Wealth Shipping Pte Ltd.  This is consistent with the wording used in clause 30 of the proforma which includes the abbreviation "M/V...", indicating that what follows is intended to be a ship's name.

37.    Without changing the meaning, we conclude that the wording could be either "*...Disponent* **Owners** *of the 'GLORY WEALTH TO BE NOMINATED'* ~~*Steamship*~~ */ Motorship See clause 30...*" and that of clause 30 would begin "*M/V GLORY WEALTH TO BE NOMINATED*" or, as the Charterers argued, "*...Disponent* **Owners** *of the "GLORYWEALTH TONNAGE TBN"...*" and "*M/V GLORYWEALTH TONNAGE TO BE NOMINATED...*".  We prefer, and find and hold accordingly, that the COA included the description of the Owners and the vessels they were obliged to provide: "*...Disponent* **Owners** *of the 'GLORY WEALTH TO BE NOMINATED'* ~~*Steamship*~~ */ Motorship See clause*

*30* " and clause 30 itself included the words *"M/V GLORY WEALTH TO BE NOMINATED"*

38     We now turn to what that expression means. In particular, does it, as the Charterers submitted, have a specific meaning requiring as a condition of the COA that any ship nominated by the Owners must be owned by them or, in order to achieve the requisite degree of contractual control, be time chartered or voyage chartered by them?[8] Alternatively, does it mean simply that the Owners are obliged to nominate ships to carry the Charterers' cargoes but without any contractual requirement in the COA for the nominated vessels to possess, vis-à-vis the Owners, any particular contractual status or relationship?

39     The term 'disponent owner' is used commonly, perhaps usually, to describe a time charterer who sub-charters to a third party the vessel which he has under time charter. The Charterers did not argue that the use of the expression " *Disponent Owners* " in the preamble[9] required the nominated vessel (to the exclusion of any other arrangement) to be time chartered to Glory Wealth. As indicated above, they argued that the nomination of a vessel time chartered *or* voyage-chartered by Glory Wealth would be a compliant nomination. They said that that was how the expression *"GLORY WEALTH TO BE NOMINATED"* (or *"Glorywealth tonnage tbn"*) should be construed and they said it was consistent with what was the most likely commercial interpretation of the words. In addition, they said that that was the understanding of the Charterers' director, Mr Luca Ferrari from whom we received both written and oral evidence. Furthermore, Mr Ferrari said it was an understanding that Flame had made known to the brokers and that was agreed between the parties when the COA was concluded.

40     We were not persuaded by the Charterers' argument. Firstly, to possess a meaning that gives proper effect to the COA, it is not necessary for the words to be construed so as to require, as a term of the COA, that the nominated vessels were time chartered or voyage chartered by the Owners. Whilst it may be likely that such vessels would be so chartered, we do not consider that the words of the COA required them to be. If it had been so important to

---

[8] As part of their general proposition the Charterers also included a slot charter party as one conferring a sufficient degree of contractual control

[9] Preceeding *'GLORY WEALTH TO BE NOMINATED'*

the Charterers, we would have expected not the cryptic expressions confined to the recap heading and the Charterers' own proforma but a clear term setting out the specific requirements in this respect of the vessels to be nominated by the Owners. Secondly, we do not think that the understanding of Mr Ferrari and his colleagues is enough. Although he says that it was agreed, there was no relevant correspondence passing between the parties recording that and no evidence from Messrs Scaletta and Wang. We are left with the recap and proforma.

41.     Thirdly, it was argued on behalf of the Owners that the COA did not require performance personally by the Owners or in fact by either party. Clause 25 of the 'Amwelsh' printed form had been amended and provided: "~~Charterer~~ *Both parties shall have the privilege of transferring part or whole of the Charter Party to others, ~~Charterer~~ each party guaranteeing to the Owner* (sic)[10] *due fulfilment of this Charter Party*". This provision came from the Charterers' proforma and, the Owners argued, showed that what mattered to the Charterers was that the Owners, Glory Wealth Shipping Pte Ltd, whom the Charterers believed to be reliable and whom they had preferred over other possible contracting parties, should guarantee performance.

42.     Mr Akka QC for the Owners submitted that under this clause formally or informally, either party could arrange for the vicarious performance of its contractual obligations but it would remain responsible to the other party for the proper fulfilment of those obligations. Furthermore, there was no requirement to obtain the other party's consent because clause 25 itself constituted consent. Mr Hancock QC for the Charterers submitted that what clause 25 did not contemplate was the Owners' pretence that they were performing in circumstances in which they did not have the requisite control over the nominated vessel which, the Charterers argued, was an essential characteristic of a contractual nomination.

43.     We find and hold that in the context of the COA as a whole, the words *"GLORY WEALTH TO BE NOMINATED"* that we have decided were included in the contract, mean simply that the Owners were obliged to nominate the ships that would carry the Charterers' cargo. From those words, we do not infer, as a term of the COA, that any ship nominated by the Owners must, for the purpose of achieving any requisite degree of contractual control or

---

[10] The word "Owner" should have been deleted and replaced by "other".

19

otherwise, be time chartered or voyage chartered by them. The word 'disponent' is most often applied to a time-chartered owner but on the Charterers' own case that limited application does not apply in this instance. What is necessary is that the Owners must have the vessel that they nominate at their disposal (by whatever means) and that the vessel nominated by them must perform the cargo-carrying voyage as required by the COA. Although the meaning of clause 25 is not entirely clear, nonetheless (and notwithstanding the use of the word 'disponent' in the preamble), it provides support for our conclusion that the Owners did not need to have the specific degree of contractual control for which the Charterers contended - i.e. that they be time or voyage charterers - but could transfer their performance obligations to another, while remaining liable under the COA for the fulfilment of those obligations. Furthermore, if the words included in the COA had instead been "*GLORYWEALTH TONNAGE TBN*" as contended for by the Charterers, for these reasons, our decision would have been the same.

44.     On the question of whether the "*GLORY WEALTH TO BE NOMINATED*" provision was a condition of the contract, we have decided that it was not a condition but an innominate or intermediate term. The remedy for any breach of such a term is a right of the innocent party to terminate if the breach is so serious as to go to the root of the contract or, if it does not, damages. Firstly, even if the Charterers are correct in the construction for which they argued, the parties did not give that construction high importance by specifying it either in the recap or in the charter-party drawn up by Bancosta some months later. Secondly, what was important was that each of the Charterers' cargoes would be carried safely to its destination in accordance with the COA, not the precise relationship between Glory Wealth and the nominated vessel. Therefore, the term did not possess the characteristics that would readily identify the provision as one which, if breached, would go to the root of the contract and thereby give the Charterers the right to terminate the contract in respect of the shipment concerned. Thirdly, the parties agreed in clause 25 that either party was at liberty to transfer performance to another; if the Owners were at liberty to perform using an intermediary or transferee, it is difficult to see how it could be a condition that they must themselves be the charterers of any nominated vessel.

45.     Having established the extent of the Owners' obligations arising out of the above wording, we now turn to what the COA required for each shipment in terms of the range of dates when the Charterers were required to declare the laycan. These are necessary firstly for

20

the purpose of defining one of the Charterers' performance obligations and secondly to enable appropriate freight rates to be used for the calculation of the quantum of any damages. In this respect, we were referred to Chitty on Contracts, 30th edition, paragraph 26-064 to the effect that any damages should be assessed as at the date when the cause of action arose – in this case as at the dates when the Charterers failed to declare the laycans. On 7th August 2012 we informed the parties that the dates when the Charterers were required to declare laycans were as follows:

### 2009 (all dates inclusive)

| | |
|---|---|
| 5th shipment | 15th to 28th September |
| 6th shipment | 8th to 21st November |

### 2010 (all dates inclusive)

| | |
|---|---|
| 1st shipment | 14th to 27th January |
| 2nd shipment | 16th to 29th March |
| 3rd shipment | 16th to 29th May |
| 4th shipment | 16th to 29th July |
| 5th shipment | 15th to 28th September |
| 6th shipment | 8th to 21st November |

46.    The reasons for our decision are as follows.  Taken from the fixture recap, the COA provides:

"- *NOMINATION CL:*

*CHRTRS TO NOMINATE LAYDAY/CANCELLING DAY WITH 10 DAYS SPREAD 30 DAYS PRIOR TO EACH LAYDAY COMMENCEMENT.*
*WITHIN 14 DAYS BEFORE COMMENCEMENT OF LAYCAN GIVEN, OWNERS TO NARROW LAYCAN TO A 7 DAYS SPREAD AND TO NOMINATE VSL OR SUB.*
*DEFINITE PERFORMING VSL TO BE NOMINATED LATEST 7 DAYS PRIOR COMMENCMENT OF NARROWED LAYDAY.*
*SUCH NOMINATION TO INCLUDE EST CARGO INTAKEN AND ETA LOADPORT.*
*AS SOON AS POSSIBLE, BUT IN ANY CASE WITHIN ONE WORKING days , CHRTRS SHALL ACCEPT OR REJECT THE VESSEL NOMINATED, SUCH RECONFIRMATION NOT TO BE UNREASONABLY WITHELD.*

*- 6 FIRM CGOS PER YEAR EACH OF 65000/10 PCT MOLOO BLK COAL*

21

*EVERY 6 SHIPMENTS TO BE DECLARED WITH FAIRLY EVENLY SPREAD EACH YEAR"*

47.    The COA provides for 6 shipments to be made within the calendar year. If the COA had said simply 'evenly spread', it would mean that the shipments would have had to be at fixed intervals of 61 days – i.e. 365 days divided by 6 produces 60.83 days and so rounding up to the next whole day makes it 61 days. Ignoring, for present purposes, the possibility that some latitude would be implied, the wording would not allow for any flexibility and so throughout the year the shipments would be at regular intervals of no more and no fewer than 61 days. For example, the shipments could be on 15th January, 17th March, 17th May, 14th July, 13th September & 13th November.

48.    The COA actually provides that the 6 shipments are to be 'fairly evenly spread' (FES). 'Fairly' modifies 'evenly' and in this context 'fairly' means 'approximately', its purpose being to introduce an element of flexibility to the timing of the shipment dates. The result is that instead of the interval between each shipment being 61 days, (a) the interval may be more or less than 61 days and (b) the intervals between adjacent shipments need not be the same. In other words, as Mr Akka QC for the Owners submitted, the shipments should take place 'about' every 2 months.

49.    We agree also with Mr Akka's submission at the hearing that the COA required each of the year's 6 shipments to be loaded within the calendar year concerned and in particular that the 6th shipment should be such as to enable the bill of lading for that shipment to be a December bill. In addition to the fact that the 1st shipment should take place after the 31st December in the preceding year, the limiting factor, therefore, is the 6th shipment. The final day on which the 6th shipment may be loaded is 31st December. For each shipment, the COA provides that 30 days before the start of the laycan the Charterers must declare the laycan with a 10-day spread. For the 6th cargo, to be shipped during the 10 days from 22nd to 31st December inclusive, therefore, the Charterers' declaration would have to be made no later than 21st November.

50.    Subject to the flexibility allowed by FES, the Charterers' declaration for the 5th shipment should be made no later than 61 days earlier – i.e. the 21st September. And similarly (again, subject to the allowed flexibility), declarations for the 4th, 3rd, 2nd and 1st

22

shipments respectively should be made no later than 22nd July, 22nd May, 22nd March and 20th January. How much flexibility should be allowed?

51.    The parties could have provided specifically how much flexibility should be available to the Charterers but they were content to leave it unspecified. This suggests to us that the Charterers did not want to limit the frequency of and intervals between the shipments to a tightly-drawn schedule and that the Owners were agreeable to that. With that in mind, we have decided that the flexibility introduced by the terms of the recap should be 14 days. With the exception of the 6th shipment, the above date for which is the latest date for the declaration, that means 7 days either side of the above dates which are subject to the allowed flexibility.

52.    On that basis, in the case of the 6th shipment the Charterers may declare during the 14 days from 8th to 21st November inclusive. In the case of the other shipments, the Charterers may declare during the period from 7 days before until 7 days after the date in question. Thus (retaining the same order as before), the 5th shipment may be declared during the 14 days from 15th to 28th September inclusive, the 4th shipment may be declared during the 14 days from 16th to 29th July inclusive, the 3rd shipment may be declared during the 14 days from 16th to 29th May inclusive, the 2nd shipment may be declared during the 14 days from 16th to 29th March inclusive and the 1st shipment may be declared during the 14 days from 14th to 27th January inclusive.

53.    The Owners claimed damages comprising the lost revenue – i.e. freight – that they would have earned by carrying the Charterers' cargoes. In broad terms, they claimed the net freight being the difference between the COA rate and the cost of earning it which is the relevant market rate. The dates relevant to the calculation of the damages are those set out above as being the dates upon which the Charterers failed to declare the laycans.

54.    Apart from the applicable rate of commission, the quantity of cargo and the C/V/E miscellaneous voyage costs, the calculation of the Owners' damages, if any, was agreed between the parties. With the agreement of Thomas Cooper for the Charterers, it was submitted to us in the form of a letter from Holman Fenwick Willan together with accompanying calculations and tables prepared by the experts: Mr Simon Everton on behalf

23

of the Owners and Mr Warren Brook on behalf of the Charterers. They allowed for a number of variables including whether the voyages would be via the Suez Canal or the Cape of Good Hope and they also provided alternative calculations to cater for our decisions in relation to the commission and the cargo quantity.

55.    On the basis of the evidence before us we have decided as follows:

(i) Commissions should be allowed at 3.75 per cent. In his report of 18th July 2012, Mr Everton explained that the parties agreed to use the BPI figure and the route description specifies total commissions of 3.75% which therefore seems to us to be the appropriate figure and we so find.

(ii) The calculation should be based on a cargo quantity of 63,600 tonnes. This is based on the draught restriction at the agreed port of Vado and we preferred the evidence that suggested that it was 41 feet or 12.50 metres.

(iii) For the C/V/E miscellaneous voyage costs, we have decided to allow US$10,000 which, compared with the calculations submitted to us, would result in an agreed reduction in the Owners' damages of US$2,500 for each of the 8 voyages with which the calulations are concerned.

56.    Based on commission of 3.75% and a cargo quantity of 63,600 tonnes, the agreed figure for the Owners' damages was US$5,446,608.60. To take account of the deduction for the C/V/E miscellaneous voyage costs, this figure falls to be reduced by US$20,000 (a total of 8 voyages at US$2,500 per voyage) to US$5,426,608.60.

57.    The Charterers challenged the Owners' claim for damages. They said that the Owners were not entitled to substantial damages unless they – i.e. the Owners - could show that, had the Charterers declared any of the laycans which they failed to declare, "...*they would have been able, financially, to perform by going out into the market and chartering in a vessel at the relevant time*".

58.    Given the decisions we have made above, there was no term of the COA that defined the Owners' performance as "...*going out into the market and chartering in a vessel at the*

24

*relevant time*".  What the COA required, as we have decided, is that, in response to the Charterers' declaration of a laycan, the Owners were required to nominate a vessel that could and would load, carry and discharge the Charterers' cargo.  Any such nomination would have to conform to the vessel description required by the COA, the nomination was subject to the Charterers' approval, and the Charterers were not allowed unreasonably to withhold their approval.

59.    From a practical point of view, however, the fact that the Owners did not themselves own ships that they could have nominated to carry the Charterers' cargoes, meant that they would have had to nominate vessels owned by other parties and to do so it is most likely that they would have chartered them (on time or voyage terms) either from their owners or from intermediate charterers.  The Charterers argued (1) that the Owners' financial position was so bad that they would have been unable to do so and, as stated above, (2) that in order to prove their loss, it was for the Owners to satisfy us that, had the Charterers declared laycans, they – i.e. the Owners – would have been capable of performing as required by the COA.  These matters generated considerable controversy.

60.    The burden of proof at (2), they said, was in keeping with the general position that a claimant must establish that it has suffered the loss in respect of which it claims damages.  They relied on *The Mihalis Angelos* [1970] 2 Lloyd's Rep. 43.  That was a case in which the vessel could not tender on or before the cancelling date and before the ship arrived, the charterer purported to cancel under a cancelling clause.  In so doing, the charterer cancelled prematurely and the ship-owner accepted the charterer's cancellation as a repudiatory breach, thereby bringing the charter-party to an end.  The owner claimed substantial damages but, upholding the arbitrators' decision, the court of appeal decided that the owner was entitled to nominal damages only.  The court's reasoning was that if the vessel had proceeded to and arrived late at the loading port of Haiphong (as would have been inevitable), it was certain (as the tribunal had found) that the charterer would have exercised its right under the cancelling clause to cancel, thereby rendering valueless the owner's rights under the charter-party and reducing the owner's loss to zero.  As a result, the claimant owner could not prove its loss and was not entitled to substantial damages.

61.    At page 58, Megaw, L.J. said:

25

"*In my view, where there is an anticipatory breach of contract, the breach is the repudiation once it has been accepted, and the other party is entitled to recover by way of damages the true value of the contractual rights which he has thereby lost, subject to his duty to mitigate. If the contractual rights which he has lost were capable* by the terms of the contract *of being rendered either less valuable or valueless in certain events, and if it can be shown that those events were, at the date of acceptance of the repudiation, predestined to happen, then in my view the damages which he can recover are not more than the true value, if any, of the rights which he has lost, having regard to those predestined events*" (emphasis added).

By analogy, in this case it was submitted on the Charterers' behalf that, owing to the Owners' poor financial state, they were and would have been incapable of performing and so, as the claimant, they could not prove their loss and were not entitled to substantial damages.

62.   The Owners' answer to this was that the principle applied in *The Mihalis Angelos* does not apply in the circumstances of this case.   In the former, following the owner's termination of the charter-party in response to the charterer's anticipatory breach, it was found to be certain that the claimant owner's rights would have been rendered valueless by the occurrence of an event that was independent of the charterer's breach – i.e. if the vessel had presented herself late at Haiphong, the event was the charterer's exercise of its contractual right to cancel which the arbitrators decided would have been bound to happen.

63.   In the present case, by reason of their failure to declare laycans, there had been an actual repudiatory breach of the COA by Flame which, on 26[st] November 2009[11] Glory Wealth accepted, thereby bringing to an end Glory Wealth's obligations as to future performance. Flame's argument was that if they – i.e. Flame - had not been in breach but had declared the laycans, owing to Glory Wealth's poor financial situation Glory Wealth would have been unable to perform - i.e. they would have been guilty of a future breach – and therefore they could not have earned the freight they claim to have lost.   Among other citations on the point, Mr Akka QC for Glory Wealth referred us to paragraph 20-082 of Treitel on Contract, 13th edition:

"*The reasoning of* The Mihalis Angelos *would not apply (so as to reduce damages to a nominal amount) where the charterers' case was that he would have been entitled to terminate on account of the shipowners'* future breach; *for once the shipowner has accepted the charterer's earlier repudiation and so terminated the contract for that anticipatory*

---

[11] In respect of the 5th & 6th shipments in 2009; the acceptances in respect of the 2010 shipments came later.

*breach, the shipowner would be relieved of any further obligation to perform so that his failure to perform on the due day could no longer be a breach".*

64.     Mr Hancock QC for Flame accepted the proposition in *Treitel* and *Benjamin* (in which reliance was also placed on *Gill and Duffus SA v. Berger & Co. Inc.* [1984] AC 382) that a party (in this case Glory Wealth) who accepts a repudiatory breach of contract is thereby relieved of the obligation of performing its own future primary obligations. What he did not accept as following from that proposition, however, was that in order to recover substantial damages the innocent party (Glory Wealth) need not prove that when the time came for performance, it would have been able to perform. In order to recover substantial, as opposed to nominal damages, he submitted, it remained necessary for the innocent party to prove that it would have been able to perform when the time came.

65.     Furthermore, the Charterers did not accept that the principle in *The Mihalis Angelos* is limited to cases where the contingency which is capable of rendering the relevant contractual right valueless is an express right of cancellation. They argued that there is no justification for the suggestion as a matter of principle and that it is wrong, and the *The Simona* [1986] 1 Lloyd's Rep. 171 was cited in support.

66.     On the application of *The Mihalis Angelos*, we are satisfied that the passage quoted from *Treitel*, above, is the correct analysis of English law at present but it is necessary to consider some of the other cases to which we were referred.

67.     The position of parties after an innocent party has accepted the other party's conduct as a repudiatory breach is set out in Lord Diplock's speech in *Gill & Duffus v. Berger* at page 390 B-D which, for clarity, we have broken up into its constituent sentences[12]:

*"The shipping documents were re-presented to the buyers…but were again rejected.*

*This time the sellers did treat the buyers' refusal to pay the price…as a wrongful repudiation of the contract and by telex…they elected to treat the contract as rescinded.*

*This had the consequence in law that all primary obligations of the parties under the contract which had not yet been performed were terminated.*

---

[12] In these passages, the position of Glory Wealth is represented by the sellers and the position of Flame by the buyers.

27

*This termination did not prejudice the right of the party so electing to claim damages from the party in repudiatory breach for the loss sustained in consequence of the non-performance by the latter of his primary obligations under the contract, future as well as past.*

*Nor did the termination deprive the party in repudiatory breach of the right to claim, or to set off, damages for any past non-performance by the other party of that other party's own primary obligations, due to be performed before the contract was rescinded*" (original emphasis).

68.     Describing the situation in *Gill & Duffus* after the sellers had accepted the buyers' repudiatory breach, Lord Diplock said at page 392 D-G:

"*The buyers...became liable to the sellers in damages for breach of contract. Prima facie, the measure of such damages would be the difference between the contract price...and the price that could be obtainable on the market at the date of the acceptance of the repudiation. Such prima facie measure might, however, fall to be reduced by any sum which the buyers could establish they would have been able to set up in diminution of the contract price by reason of a breach of warranty* [by the sellers] *as to description or quality of the goods represented by the shipping documents that had actually been shipped by the sellers if those goods had in fact been delivered to* [the buyers].

We consider the reference in this passage to a breach of warranty by the sellers to be a reference to a pre-existing breach – i.e. a breach that pre-dated the sellers' acceptance of the buyers' repudiatory breach – and as such it would fall within the ambit of past non-performance referred to in the final sentence quoted at paragraph 67 above.

69.     At page 396 A-B Lord Diplock continued in similar vein:

"*As already mentioned, if the seller sued the buyer for damages for his failure to pay the price of the goods against tender of conforming shipping documents, the buyer, if he could prove that the seller would not have been able to deliver goods under those shipping documents that conformed with the contract of sale, would be able to displace the prima facie measure of damages by an amount by which the value of the goods was reduced below the contract price by that disconformity*".

70.     Mr Akka QC for Glory Wealth submitted that the effect of what Lord Diplock said was that the buyer, if he could prove the seller was *already* in breach (by having shipped non-conforming goods), might displace the *prima facie* measure of damages.  But in *Gill & Duffus* the buyer could not do so because the certificates of the cargo's conformity were agreed to be final and so there could be no proof that off-specification goods had been shipped.  We agree with this analysis.

28

71      As for *The Simona*, we are satisfied that it involved a different situation  The vessel was due to load a part cargo of steel but was delayed and at risk of missing her cancelling date of 9th July  Before loading the steel she was due also to load a part cargo of granite blocks  On 2nd July, the charterers informed the owners that they were cancelling the contract  The owners did not accept the charterers' purported cancellation and so the charter-party remained in existence  On 5th July, the owners told the charterers that the vessel would be ready to start loading on 8th July  In the event, she arrived and tendered her notice of readiness on 8th July  The arbitrators found that the charterers' cancellation of the charter party on 2nd July was wrongful and that it could not be validly cancelled until after close of business on 9th July  On 8th July, however, the charterers had started loading the intended steel cargo aboard another vessel

72      The owners claimed damages and, in view of the need to load the granite blocks first, there was a dispute as to whether the vessel would in fact have been ready and able to start loading the charterers' steel before the cancelling date  Mr Justice Leggatt held that it was for the owners to prove their loss and they had to show that the vessel would have been in a position to load in time  It was not for the charterers to show that the owners could not have done so  In contrast with the present case, *The Simona* is a case in which (i) the innocent party (the owners) did not accept the charterers' conduct as a repudiatory breach, (ii) the charter-party remained in existence, and so (iii) the owners were not relieved of their obligations, one of which was to be ready to start loading the steel no later than 9th July  For those reasons, we do not think *The Simona* is of assistance in this case

73      We now consider the situation in this case in light of the law as stated above  In this case Glory Wealth has sought to recover its loss by reference to the *prima facie* measure of damages which is the difference at the material times between the contract rate of freight and the market rate of freight  On the authority of *Gill & Duffus*, in order to displace that *prima facie* measure of damages Flame must prove that at the times when Glory Wealth accepted Flame's repudiatory breaches (in failing to declare laycans), Glory Wealth was *already* in breach  Flame has alleged that, in breach of the COA, Glory Wealth was already at those times so financially incapacitated that if Flame had declared laycans, it would have been unable to nominate ships to perform any of the 5th & 6th shipments in 2009 and all 6 shipments in 2010  We find and hold that as Glory Wealth were only required to nominate

29

ships after Flame's declaration of laycans, it must follow (1) that any such disabling financial incapacity on Glory Wealth's part would constitute a future breach and not a past breach and therefore (2) that it is not open to Flame by reference to such future breach to displace the *prima facie* measure of damages.

74.     Therefore, we find and hold that the Owners are entitled to substantial damages. Based on the agreed calculation, those damages amount to US$5,426,608.60 as referred to in paragraph 56 above.

75.     Before deciding whether that is the definitive amount of damages, it is necessary to deal with an issue that arose obliquely only during the hearing but more directly afterwards. According to the witness statement of Flame's Mr Ferrari, during a conversation he had with Captain Jin Jiang Zhang of Bilgent, Captain Zhang said that in order to engage vessels to perform the COA, Glory Wealth would be willing to pay a premium to the vessels' owners or disponent owners -- i.e. an enhanced rate of freight above the market rate.  Flame argued that this had two effects: firstly it supported their argument that, in particular, the alleged arrangements involving Haifeng Shipping Corporation for the 3rd & 4th shipments performed by the La Jolla and the Ocean Crystal respectively were a sham; and secondly, if the only way in which Glory Wealth could perform the COA was by chartering-in (directly or indirectly) at a premium, then their losses resulting from Flame's failure to declare laycans would be less and any substantial damages to which they might be entitled should be reduced accordingly.

76.    Flame said that it was only at the start of the hearing that, in compliance with an order from us, Glory Wealth disclosed un-redacted versions of certain documents revealing the freight rates agreed by Glory Wealth for the La Jolla and Ocean Crystal.  Following a contested application by Flame after the hearing, (a) in respect of the probable market rates on 17th August and 22nd September 2009 – i.e. at the time of the 3rd & 4th voyages - we allowed the introduction of additional evidence in the form of a joint memorandum from the experts Messrs Brook & Everton; and (b) we asked both parties to let us have any submissions they wished to make on whether and if so in what way that additional evidence should affect our deliberations.  We deal below with the "sham" allegation but consider first the market rate/premium issue.

30

77.    The effect of the experts' additional evidence on the relevant market rates was that Glory Wealth had chartered-in the La Jolla and Ocean Crystal at a significant premium – of the order of 40%. If it were assumed that Glory Wealth's chartering arrangements for the un-performed 5th & 6th shipments in 2009 and shipments 1 to 6 in 2010 would have been possible only if they agreed similar premiums, then their losses arising out of the non-performance of those shipments would be considerably reduced and any award of damages ought to reflect that.

78.    The question that it was necessary for us to consider, therefore, was whether, in all the circumstances and taking account of all the evidence before us, it was justified to make such an assumption or to draw an inference to that effect. For the reasons below, we have decided that no such assumption or inference is justified.

(a) The only direct evidence of premiums is that of the La Jolla & Ocean Crystal fixtures but there was no evidence from Glory Wealth or elsewhere as to why such premiums were agreed or whether they would be necessary in the future.

(b) Furthermore, those two fixtures were in August and September 2009 and we are not convinced that it would be right to decide that over the following 12 to 14 months the same causes (whatever they were) would still be operating to oblige Glory Wealth to charter-in at a premium.

(c) The market is influenced by many factors and conditions, and any premium would be similarly influenced, including by the attitude to risk of individual owners or disponent owners. Therefore, even if it were justified to infer that a premium would be payable by Glory Wealth, it would not be possible to say that the premium would be 40% or some other figure.

79.    Therefore, although for the 3rd & 4th shipments the La Jolla & the Ocean Crystal were chartered-in at rates that were above the market, that does not justify our drawing from the circumstances surrounding those particular fixtures the general conclusion that, thereafter, all the shipments that remained to be performed by Glory Wealth (had Flame declared laycans) would have to have been above the market either to the same extent or at all. Accordingly, we find and hold that the figure of US$5,426,608.60 referred to in paragraph 56 above

31

represents Glory Wealth's loss and is the amount which they are entitled to recover as damages

80      As for the "sham" allegation, we did not consider that the additional expert evidence of the market rates on 17th August and 22nd September 2009 had any bearing one way or the other on the genuineness or otherwise of Glory Wealth's evidence of the fixtures involving the La Jolla & Ocean Crystal or other vessels

81      As mentioned above, the issue relating to the Owners' alleged inability to perform and its possible consequences was controversial  Because of our decision above, it is unnecessary for us to deal with it  In case we are wrong in our decisions above (so that, after the Owners had accepted the Charterers' repudiatory breach, in proving their loss the Owners would be required also to prove their future ability to perform) we now consider this issue

82      As a preliminary comment, we acknowledge that the fall in the market in the autumn of 2008 generated lasting turmoil which resulted in very difficult trading conditions for all the businesses operating in it, especially those with long term commitments  This is clear from the evidence of the Owners' situation that was placed before us  Equally we accept that the Charterers had genuine concerns that, in the febrile atmosphere that existed, the seizure of a ship under charter to Glory Wealth that was loaded with cargo destined for one of the Charterers' customers (a) was a significant risk and (b) would have created a very serious and possibly disastrous situation for the Charterers

83      As a second comment, we record our dissatisfaction with Glory Wealth's disclosure  This was a dispute in which, from the outset, Glory Wealth's financial capability and ability to trade so as to be able to fulfil its obligations under the COA were in issue  By way of example, the affidavit of Mr Xu was acquired by the Charterers via other sources prior to its eventual disclosure by Glory Wealth and Glory Wealth's own disclosure in respect of its financial position in 2009 and 2010 was confined to a one-page so-called 'management report'  As Mr Hancock QC said in his closing submissions *"What this document is, where it has come from, and the source of the data in it are all wholly unclear  But, in any event, it shows that, in 2009, Glory Wealth's net operating loss was a tad under US$100 billion  HFW have, since that document was disclosed, said that that figure is a mistake and the true figure is US$100 million  Be that as it may, the document shows only that Glory Wealth*

32

*suffered staggering losses in 2009…*". For 2010, the loss was stated to be more than US$5 billion although it was submitted by Holman Fenwick Willan that the reference to billions should have been to millions.

84.    As for Glory Wealth's trading activities of which we have evidence, Mr Hancock summarised Flame's case as being that: "*…Glory Wealth's financial position was already so bad in 2009 that they could not utilise Glory Wealth tonnage to perform the third and fourth shipments. Instead, they went about constructing an elaborate charade…*". As examples, he referred to the 3rd & 4th shipments in the La Jolla and Ocean Crystal respectively and he said Glory Wealth's position in 2010 was no better.

85.    As we have decided above, the "*GLORY WEALTH TO BE NOMINATED*" or "*Glory Wealth tonnage tbn*" wording meant no more than that, for each shipment for which the Charterers had declared a laycan, the Owners were required to nominate a vessel that would perform the cargo-carrying voyage as required by the COA. Apart from that, there is no special meaning to be attached to these words and so the Owners' ability to utilise "*Glory Wealth tonnage*" is satisfied if the vessel nominated by the Owners is capable of and does load, carry and discharge the Charterers' cargo.

86.    The elaborate charade alleged by the Charterers included, in the case of the La Jolla and Ocean Crystal, for example, allegations: that the vessel was not on charter to Glory Wealth (and therefore not Glory Wealth tonnage); that statements by Glory Wealth and its witnesses to the effect that she was, were lies; and that documents produced by the Owners in support of their assertion that she was on charter to them were a sham involving a non-existent company. Among the Charterers' submissions were the following:

"*On 17 August 2009, after many exchanges on the point, Glory Wealth again positively confirmed that they had chartered in the vessel to perform the shipment…However, the tribunal should again find that this was a lie. Glory Wealth had not chartered the vessel Bilgent had chartered the vessel, on terms that they would make the vessel available, as a favour, to individuals connected with Glory Wealth, in exchange for a freight payment that was above the then current market rate. There was to be no binding contract involving Glory Wealth, contracts with whom were regarded as toxic in the extreme. The amount of the freight was for a long time hidden by the use of redactions in the "disclosure", as and when it was forthcoming, redactions said to be justified on the grounds of commercial confidentiality – as to which see above. According to what Captain Zhang of Bilgent told Mr Ferrari, freight was paid in advance, no doubt because Glory Wealth was not a good credit*

33

*risk. Since no payment documentation has been produced (ie no bank transfers or bank accounts) this cannot be checked*

*What happened therefore is that Bilgent were the charterers/disponent owners of the LA JOLLA, Glory Wealth did not charter from them, nor in fact did they charter the vessel at all Instead, they produced a sham document with a non-existent entity (Haifeng)[13], pretended they were disponent owners, procured the cargo to be loaded on board a Bilgent vessel, for which facility they arranged for Bilgent to be paid the full freight in advance and probably at a premium to the market"*

87     These were serious allegations, the fraudulent character of which was not pleaded as such and, as it is unnecessary for us to decide them, we do not do so   For the purpose of forming a view on the Owners' ability to perform the COA, however, it is necessary for us to consider the evidence and we now do so   Unfortunately, the Owners' disclosure was no better in this respect

88     The evidence shows that the Owners were in considerable financial difficulty in 2009 and 2010 (which was not disputed by the Owners) and Mr Xu in his affidavit indicates that Glory Wealth was deeply insolvent by 2011   As described by Mr Xu in his affidavit, the impact on Glory Wealth's business of the worldwide financial and economic crisis in the autumn of 2008 was both rapid and severe   Not only were the Owners unable to meet their own financial obligations but many of those with whom they had contracted were unable to pay to Glory Wealth what they owed to Glory Wealth   It seems to us likely that the company became and continued to be insolvent from early in 2009 but if there is any doubt about that, in view of the Owners' poor disclosure in relation to their financial position, we draw the adverse inference that the Owners were already insolvent in 2009 and 2010

89     In addition, we accept the Charterers' evidence that Glory Wealth's financial woes were common knowledge in the market already in 2009   This is clear from Flame's witness statements and from the Gray Page report obtained on Flame's behalf   It seems likely to us that the Owners would therefore have been unable to obtain credit either in 2009 or 2010   To the extent that Glory Wealth might still have had vessels on time charter during 2009 and 2010, they were not suitable for the COA - i e not Panamaxes   Glory Wealth had no ships of

---

[13] Glory Wealth alleged that the La Jolla and Ocean Crystal were voyage chartered to them from Haifeng Ocean Shipping Corporation of Hong Kong (' Haifeng")

34

which they were the owner and as they would not have been able to obtain credit it seems highly likely, as argued by Flame, that Glory Wealth would have been unable to enter into new time charters for the COA [14] Glory Wealth said they were not planning on transferring their obligations under clause 25 (although they argued they could have done) and that they intended to perform the shipments under the COA

90     In the report dated 23rd July 2009 from Gray Page Intelligence Services Ltd (instructed on behalf of Flame), there is some support for the idea that Glory Wealth (referred to as "GWS") continued to trade but the conclusion is subject to significant qualifications

*"Glory Wealth Shipping Pte Ltd has been identified to remain an active company   However, asides from one ongoing contract of affreightment with Fortescue Metals Group Ltd by GWS we have not been able to identify any ongoing charter dealings being undertaken by any other member of the Glory Wealth Group*

*The vast majority of our sources have advised that GWS would not be able to charter in a vessel under its own name at this time due to the level of claimants chasing the company Only Fortescue has been able to give any suggestion that the company remains active and it is believed that this will only be possible with the assistance of Fortescue itself*

*It has been noted that the Star Yantai spent a significant time detained in India   This supports the belief that claimants who identify any GWS chartered-in vessels in an arrest friendly jurisdiction would be likely to result in the detention of the vessel, and the resulting costs associated with the delay to the vessel for any counterparty*

*The decision by Nordea Bank to force the sale of two newbuildings at a significant loss to GWS coupled with the other financial concerns following the losses from the scrapping of two other vessels leads us to believe that GWS will be unlikely to be able to nominate a vessel for your contract lifting without the use of an intermediary operator to shield its activities from identification within the market "*

91     In support of their assertion that they retained and exploited their ability to charter-in tonnage, Glory Wealth relied on evidence of 14 single voyage fixtures that they say they entered into in 2009 and 2010   They include the La Jolla and Ocean Crystal which were used to fulfil the 3rd & 4th shipments   As we have said above, in the sense that these 2 vessels were not chartered by Glory Wealth, the Charterers said these fixtures were not genuine

---

[14] If Glory Wealth was a time charterer, in many jurisdictions Glory Wealth's bunkers could be the subject of attachments or other legal procedures causing delay to the vessel

35

92.    According to the Owners' evidence, they still had a number of profitable contracts (the COA being one of them) and Mr Xu stated in his affidavit that provided Glory Wealth was and remained protected from its creditors, it still had a viable business.  It is also the case, as Glory Wealth's Mr Zhang asserted in his evidence, that following the decline in the market, there was a plentiful supply of Panamax tonnage and probably there were many owners who would have been willing to fix with Glory Wealth on a voyage charter basis provided 100% of the freight was paid in advance.  Furthermore, if the Owners were also willing to pay a premium (as suggested by Captain Jin Jiang Zhang of Bilgent, according to the statement of Mr Ferrari who recounted a conversation with Mr Zhang) then the likelihood of being able to voyage charter suitable vessels would be even greater.

93.    The main elements of Flame's arguments were as follows:

(a)  As regards the 3rd and 4th shipments, the ships were not on charter to Glory Wealth because Haifeng Ocean Shipping Corporation (which was said by Glory Wealth to be the company from which Glory Wealth voyage chartered the vessels) did not exist.  As a favour to individuals connected with Glory Wealth and in exchange for freight that was above the then market rate the shipments were in fact performed by Bilgent which made the vessels available for Glory Wealth's COA business.  They said that the numerous operational e-mails ostensibly from Haifeng to Glory Wealth were forgeries and in support of that they pointed to evidence that both Captain Zhang and Mr Tan worked for Bilgent.  We agree with Mr Akka QC that the suggestion that Glory Wealth forged over 80 documents with the e-mail addresses of Mr Tan or his colleagues shown on them is, on the face of it, implausible.  If as the Charterers allege, Bilgent simply performed the shipments in the absence of a charter-party either with Haifeng or Glory Wealth, then the numerous e-mails involving discussions concerning laytime calculations cannot be explained.  It seems to us likely that there was a chartering arrangement of some kind between Glory Wealth and Bilgent, with or without Haifeng in the charter-party chain.  Two possible explanations (there may be others) are: (1) that Glory Wealth chartered the vessels directly from Bilgent or (2) that Glory Wealth chartered the vessels using Haifeng (possibly, a Bilgent-controlled company) as an intermediary company on back-to-back terms.  This would be to try to improve the concealment (from the head owners) of Glory Wealth's involvement and Bilgent were clearly aware of the arrangement, hence the involvement of Mr Tan.  This would also explain the fixture recaps dated 17th August and 22nd September.  The arrangement at (2) is the more

36

likely explanation (given Mr Ferrari's witness statement) but however it was done, we are satisfied on a balance of probabilities that the ships were properly nominated in compliance with the requirements of the COA.

(b)   The Charterers said also that the single voyage fixtures relied upon by Glory Wealth as evidence of their continuing ability to charter-in tonnage during 2009 and 2010 were not genuine and the documents fakes.  For 2009 and 2010, Glory Wealth listed 14 of these and we look at each one in turn.   Originally, the documents concerned had been disclosed in redacted form so that some e-mail addresses, the identities of the ship owners, the freight, demurrage and despatch rates, maximum port charges and the contact details of the sender of the forwarded message could not be read.  The Owners claimed the details were confidential but eventually, we ordered their production and disclosure at the hearing.

(i) m.v. Genco Titus -- the document was an e-mail of 2 pages dated 21st February 2012 from First Goal Worldwide (chartering@firstgoal.net) to chartering@firstgoal.net.  It forwarded an "Original Message" dated 10th March 2009 from Wei Juan of China Cosco Bulk Capesize Fleet to e-mail addresses appearing as "*Cape / Glory Wealth*" and "*tangxiadong.gws*" and addressed to Tang Zong - Guangfu[15] confirming a clean fixture dated 10th March 2009.  The owners named in the fixture are "Cosbulk" and it provided for "*...100% FRT to be paid WI 10 BDS AFTER COMPLETIONOF LOADING...*".  The detailed freight invoice dated 7th April 2009 addressed to Baoshan Iron & Steel Co., Ltd was raised by Glory Wealth, names Glory Wealth as the beneficiary and HSBC Singapore as the beneficiary's bank.  The fixture was about the time when the 1st and/or 2nd shipments were due to take place and therefore pre-dates the 3rd, 4th, 5th & 6th shipments in 2009.  The voyage was from Brazil to China with a cargo of iron ore.  No operational documents relating to the performance of the voyage were disclosed.

(ii) m.v. Aquabella - the document was an e-mail of 2 pages dated 21st February 2012 from First Goal Worldwide (chartering@firstgoal.net) to chartering@firstgoal.net.  It forwarded an "Original Message" dated 28th August 2009 from Jiang Ning of Seawin to Wang Guangfu of Glorywealth containing a recap (not stated to be final) for a voyage charter-party and a

---

[15] This would appear to refer to Mr Wang Guangfu whose e-mail address in later messages is shown as wangguangfu@glorywealth.com.

37

request for comments. It refers to a charter-party date of 27th September 2009 and laycans of 10th to 19th August which is a discrepancy that remains unexplained. The owners are named as "Seawin Chartering Ltd" and it provides for "*95 PCT FRT IN USD PAYABLE W/I 5 BANKING DAYS AFTER RECEIPT freight INVOICE, COMPLETION OF LOADING...*" The freight invoice dated 18th September 2009 was raised by Glory Wealth and addressed to Baoshan Iron & Steel Co. Ltd.. The named beneficiary was Evensource Ltd, a feature of Glory Wealth's arrangements to which Flame were to object in connection with the 3rd shipment in 2009 aboard the m.v. La Jolla. The bill of lading date was stated to be 14th September 2009. The voyage was from Port Hedland, Western Australia to China with a cargo of iron ore. No operational documents relating to the performance of the voyage were disclosed.

**(iii) & (iv) m.v. La Jolla & m.v. Ocean Crystal** – the documents are e-mails each of 4 pages dated 17th August and 22nd September 2009 respectively, sent by Mr Lei Zhang of Glory Wealth (from whom we heard evidence at the hearing) to Captain Zhang of Bilgent (zhang@bilgent.com) referring to clean recaps and confirming "*...MAINTERMS FIXED ASF...*". The owners were named as "HAIFENG OCEAN SHIPPING CORP." but there was no explanation from Mr Zhang, as to why they were sent to Bilgent. Freight was agreed to be payable 100 per cent within 5 banking days from signing/releasing bills of lading.

In the case of the La Jolla, Haifeng's invoice was dated 31st August 2009, was stamped and signed by Haifeng and was based on a freight rate of US$26.5 per tonne which conformed to the fixture recap. There were further undated invoices/statements sent by Haifeng to Glory Wealth by email on 9th, 20th and 25th November 2009 which included claims for deadfreight and demurrage. These invoices stated that Glory Wealth paid Haifeng various amounts on 28th August and 2nd September 2009. All of the invoices raised by Haifeng stated that remittance should be made to their account with the Bank of East Asia Ltd, Hong Kong.

For both the La Jolla and the Ocean Crystal, the freight invoices (dated respectively 25th November and 6th October 2009) that were raised by Glory Wealth addressed to Flame named Glory Wealth as the beneficiary with an account with United Overseas Bank Ltd in Singapore, although the invoice initially raised by Glory Wealth addressed to Flame dated 31st August 2009 for the La Jolla shipment named Evensource Ltd as the beneficiary and a bank account with HSBC, Singapore. It was only after Flame refused to pay this invoice that,

38

via the parties' solicitors initially by fax on 25th September 2009 and then subsequently by their revised invoice dated 25th November 2009 referred to above, Glory Wealth provided their own banking details.

In the case of the Ocean Crystal, by letter dated 30th September 2009 to the agents PT Indo Dharma in Jakarta the master gave authority for the signing by the charterers of the bills of lading.  In so doing, he described the vessel as being chartered to Bilgent under a charter-party dated 11th June 2009.  Haifeng raised a proforma invoice dated 5th October 2009, stamped and signed by Haifeng and addressed to Glory Wealth.  It was for the total freight for 63,215 tonnes at US$29 per tonne as per the fixture recap.

Whilst some of the documents were, to say the least ambiguous and/or unexplained, the operational correspondence disclosed by the Owners provides credible evidence that these vessels were voyage chartered by Glory Wealth either from Bilgent or from Haifeng and on the balance of probabilities, we find and hold that they were so chartered.

(v) m.v. Omaha - the document was an e-mail of 1 page dated 21st February 2012 from First Goal Worldwide (chartering@firstgoal.net) to chartering@firstgoal.net.  It forwarded an "Original Message" dated 24th September 2009 from cape@glorywealth.com to chartering@seawinshipping.com and addressed to Jiang Ning confirming a clean fixture in respect of a vessel to be nominated by the owners (presumably, in the event, the m.v. Omaha).  The owners are named as "seawin chartering ltd".  The laycan was 26th October to 7th November 2009.  The freight rate is specified but there is no mention of when freight would become payable.  The recap lacks detail but states: "*other terms and conditions as per chrs btb head proforma c/p*".  The voyage was from Brazil to China with a cargo of iron ore.  Glory Wealth's freight invoice to Baoshan Iron & Steel Company Ltd was dated 11th November 2009 and showed a bill of lading date of 7th November 2009.  The beneficiary was shown as Evensource Ltd.  No operational documents relating to the performance of the voyage were disclosed.

(vi) m.v. Mineral Nippon - the document was an e-mail of about 1½ pages dated 21st February 2012 from First Goal Worldwide (chartering@firstgoal.net) to chartering@firstgoal.net.  It forwarded an "Original Message" dated 22nd October 2009 requesting confirmation of an earlier original message dated 12th October 2009 from Jiang

39

Ning of chartering@seawinshipping.com to Wang Guangfu of Glory Wealth being a clean recap in respect of the m.v. Mineral Nippon or substitute. The owners are again named as "seawin chartering ltd". The laycan was 4th to 13th November 2009. The freight rate is specified but there is no mention of when freight would become payable. The recap lacks detail but states: *"other terms and conditions as per chrs btb head proforma c/p"*. The voyage was from Brazil to China with a cargo of iron ore. Glory Wealth's freight invoice to Baoshan Iron & Steel Company Ltd was dated 18th November 2009 and showed a bill of lading date of 14th November. The beneficiary was shown as Evensource Ltd. No operational documents relating to the performance of the voyage were disclosed.

**(vii) m.v. Vanessa Oldendorff** - the document was an e-mail of 1 page dated 21st February 2012 from Mr Zhang Yisi [chartering@chipolpek.com] to First Goal Worldwide. It forwarded an "Original Message" dated 4th December 2009 from Mr Zhang Lei [panamax@glorywealth.com] to Mr Liu [chartering@chipolpek.com] containing a clean recap. The owners are named as *CHINAESE* (sic) *POLISH BEIJING INTERNATIONAL FORWARDING COMPANY LTD*". The laycan is 15th to 25th December 2009. The freight rate is stated but there is no mention of when freight becomes payable. The recap lacks detail but states: *"OTHER TERMS ASPER CHRS BTB HEAD C/P"*. The voyage was from Canada to China with a cargo of coking coal. Glory Wealth's freight invoice to Baoshan Iron & Steel Company Ltd showed a bill of lading date of 27th December 2009. The beneficiary was shown as Evensource Ltd. No operational documents relating to the performance of the voyage were disclosed.

**(viii) m.v. STX Freesia** - the document was an e-mail of 2 pages dated 21st February 2012 from First Goal Worldwide (chartering@firstgoal.net) to chartering@firstgoal.net. It forwarded an "Original Message" dated 16th December 2009 from a sender by the name of Lui Shanghai whose e-mail address was indicated by "*chartering*" to a recipient whose e-mail address was indicated by "*Wang Guang Fu*". But in neither case was there an actual e-mail address. It confirmed a clean fixture in respect of the m.v. STX Freesia or substitute, the owners of which were named as "*CHINESE POLISH (BEIJING) INT. FORWARDING CO LTD*". The document is signed off by "*LIU SHANGHAI DEC. 15.2009*". The laycan was 1st to 10th January 2010 and the voyage was from one safe port Western Australia (Port Hedland, Dampier or Port Walcott to Majishan plus Baoshan, China with a cargo of iron ore. 95 per cent of the freight was to be paid within 5 banking days of signing and releasing the bills of

40

lading and always before breaking bulk, the balance to be paid within 30 days of the completion of the voyage. The freight invoice to Baoshan Iron & Steel Company Ltd was dated 26th March 2012 (presumably a typographical error) and showed a bill of lading date of 13th January 2010. The beneficiary was shown as Evensource Ltd. No operational documents relating to the performance of the voyage were disclosed.

(ix) m.v. Xin Jin Hai - the document was an e-mail of 2 pages dated 21st February 2012 from First Goal Worldwide (chartering@firstgoal.net) to chartering@firstgoal.net. It forwarded an "Original Message" dated 18th December 2009 from "*LIU SHANGHAI, CHIPOLPEK BEIJING*", [chartering@chipolpek.com] to cape@glorywealth.com and to Wang Guang Fu [wangguangfu@glorywealth.com] confirming a clean fixture recap. The owners are again named as "CHINESE POLISH (BEIJING) INT FORWARDING CO. LTD". This was a more detailed recap showing the freight rate and that 95 per cent of the freight would be payable within 7 banking days after signing and releasing bills of lading. The bills were to be marked "*FREIGHT PAYABLE ASP C/P...*". The laycan was 7th to 16th January 2010 and the voyage was from Brazil to China with a cargo of iron ore. The freight invoice to Baoshan Iron & Steel Company Ltd was dated 23rd February 2010 and showed a bill of lading date of 25th January 2010. No operational documents relating to the performance of the voyage were disclosed.

(x) m.v. Ligari – the document was an single page e-mail dated 28th January 2010 from Mr Zhang Lei of Glory Wealth [panamax@glorywealth.com] to Liu Zong [chartering@chipolpek.com] confirming a clean recap. The owners are named as "*CHINAESE POLISH BEIJING INTERNATIONAL FORWORDING COMPANY LTD*" (sic) and 100 per cent of the freight was to be paid within 3 banking days of signing and releasing bills of lading. The voyage was from Canada to China with a cargo of coking coal. Glory Wealth's freight invoice to Baoshan Iron & Steel Company Ltd was dated 16th March 2010 and showed a bill of lading date of 27th February 2010. Terms other that those specified in the recap were to be as per Glory Wealth's back-to-back charter-party. No operational documents relating to the performance of the voyage were disclosed.

(xi) m.v. Formosabulk Brave - it is not clear from whom or to whom this document of 2½ pages was sent as the e-mail addresses simply state from "*Cape*" and to "*Chartering*". It is dated 28th January 2010 and appears to be addressed to Liu Zong. It is said to contain a clean

41

recap and the owners are named as Chinese Polish (Beijing) Int. Forwarding Co. Ltd and as with the other fixture e-mails, it is said to be for the account of Glory Wealth. 100% of the freight was to be paid within 10 days after signing and releasing bills of lading. The laycan was 4th to 13th February 2010 and the voyage was from Mauritania to China with a cargo of iron ore. Glory Wealth's freight invoice to Yinshan Section Steel Corporation of Laiwu Steel Group Ltd bore the date 25th February 2010 and showed a bill of lading date of 21st February 2010. The beneficiary was Evensource Ltd. No operational documents relating to the performance of the voyage were disclosed.

**(xii) m.v. Guofeng First** – the document was an e-mail of 2 pages sent by First Goal Worldwide (chartering@firstgoal.net) to chartering@firstgoal.net on 21st February 2012  It forwarded an "Original Message" dated 10th February 2010 from Liu at "*chartering*" to "*Wang Guang Fu*" (presumably the Mr Wang at Glory Wealth ) confirming a clean fixture recap agreed on 9th February 2010. The owners are named as Chinese Polish (Beijing) Int. Forwarding Co. Ltd with the puzzling request "*PLS ADVISE FULL STYLE*". It also stated the e-mail address chartering@chipolpek.com. The e-mail ends with the name Chinese-Polish (Beijng) International Forwarding Company Limited together with telephone numbers preceded by 86 which is the international code for China. The laycan is given as 15th to 24th February 2010 and the voyage was from Port Hedland in Western Australia to Qingdao in China with a cargo of iron ore. Freight was to be paid 100% against the bill of lading quantity within 5 business days after receipt of the owners original freight invoice. Glory Wealth's final freight invoice to Fortescue Metals Group Ltd of Perth Western Australia (with whom Glory Wealth had a contract of affreightment) was dated 20th April 2010 and showed a bill of lading date of 22nd February 2010. Again, the beneficiary was shown as Evensource Ltd. No operational documents relating to the performance of the voyage were disclosed.

**(xiii) m.v. Cape Northville** - the document was an e-mail of about 2 pages dated 21st February 2012 from First Goal Worldwide (chartering@firstgoal.net) to chartering@firstgoal.net. It forwarded an "Original Message" dated 30th April 2010 from "*First Goal Worldwide*" to "*Wang Guangfu*" containing a clean recap. The owners are named as First Goal Worldwide Inc. It records that "*...95 PCT FREIGHT TO BE PAID WITHIN 3 BANKING DAYS AFTER SIGNING AND RELEASING OF BILLS OF LADING BUT ALWAYS BEFORE BREAKBULKING...*". The laycan was 5th to 14th May 2010 and the

42

voyage was from Western Australia to China with a cargo of iron ore.  No invoices or operational documents relating to the performance of the voyage were disclosed.

**(xiv) m.v. Iron Baron** – the document of 1 page is dated 9th June 2010 and purports to be from Seawin Shipping Ltd - Chartering Dept., sent by someone identified as "*hongtao*" to someone identified as "*zhanglei*".  There is no evidence that this document was an e-mail or that it was actually sent to its intended recipient   It is said to confirm a clean recap of a charter-party agreed on 3rd June 2010.  The owners are not named in the document.  No operational documents relating to the performance of the voyage were disclosed.  An invoice dated 9th July 2010 addressed to Yinshan Section Steel Corporation of Laiwu Steel Group was disclosed.  It referred to a bill of lading dated 6th July 2010 and the named beneficiary was Evensource Ltd.

94.     In paragraph 93(b)(iii) & (iv) above dealing with the La Jolla and Ocean Crystal shipments, we have said that although there are ambiguous and/or unexplained aspects of the evidence, with the benefit of having seen operational correspondence and with the knowledge also that those cargoes were actually loaded, carried and discharged by the two ships nominated by the Owners, we are satisfied that they were chartered by Glory Wealth either from Bilgent or from Haifeng.  The same cannot be said, however, for the evidence in respect of the remaining 12 vessels on which the Owners relied as evidence of their ability to continue trading during 2009 and 2010 and in particular their ability to fulfil their obligations under the COA.  This was evidence uniquely in the possession of the Owners.

95.     In that connection, there are a number of unsatisfactory features of the above evidence and they include the following:

(a) in respect of none of the above recap e-mails of which the Owners gave disclosure was a signed or unsigned formal charter-party provided;

(b) the role of and/or relationship between Glory Wealth and First Goal Worldwide were not explained satisfactorily, including the fact that copies of many of the recaps were provided to the Owners by First Goal Worldwide in February 2012;

43

(c) first Goal Worldwide is named as the owner in the Cape Northville fixture, but we do not know why its chartering department would have details also of the fixtures relating to the Genco Titus, the Aquabella, Omaha, the Mineral Nippon, and others;

(d) the role of and/or relationship between Glory Wealth and Seawin Chartering, which features in many of the recaps, were not explained satisfactorily;

(e) it was not explained why the recaps for the Aquabella, Mineral Nippon and STX Freesia voyage fixtures contained performance warranties;

(f) the document evidencing the fixing of the Aquabella was not a final or clean recap but is described as 'revised' and contains a request for comments;

(g) no operational correspondence or other documentary evidence relating to the performance of the voyages was disclosed;

(h) most of the recaps on which the Owners rely were agreed by reference to other charterer-parties, none of which was disclosed; and

(i) although disclosure was given of copy invoices, there was no evidence of any actual payments either to or by Glory Wealth or to or by anyone on its behalf in respect of any of the voyages which were the subject-matters of the recaps.

96.    To support their argument that Glory Wealth were not active in the chartering market for the whole of 2009 and 2010, the Charterers produced a written statement by Mr Michael Robson, a director of the Baltic Exchange.  Although Mr Robson stated that Baltic Exchange reports of fixtures account on average for only between 10 and 15 per cent of total fixtures (that appears to have been common ground), the almost complete absence of reports of fixtures involving Glory Wealth since the end of 2008 suggests their level of activity fell dramatically.  We accept that evidence as far as it goes.  We recognise, however, that because of their parlous financial state, any business that Glory Wealth did conduct they preferred to do so "off-market", in order to conceal their involvement.  Therefore, the absence of publicly-available market evidence of Glory Wealth's activities is not evidence that they were in fact entirely absent from the market.

44

97.      It is unfortunate that this evidence adduced by the Owners in support of their assertion that they would have been able to fulfil their obligations under the COA had the Charterers declared laycans for the 5th and 6th shipments in 2009 and the 6 shipments in 2010, was opaque, lacking in substance and corroboration and lacking in explanations of discrepancies and other puzzling features.  Evidence that the 3rd & 4th shipments in 2009 were carried successfully (about which there was no dispute) was helpful but not, even with this additional material, sufficient.   What we also had, however, was a number of factors (set out below) that, in the end, we found sufficiently persuasive to tip the balance in favour of a finding that Glory Wealth would have been able to perform the COA if Flame had called upon them to do so.

(a)  Particularly following the collapse of the market in the last quarter of 2008, the COA was a very favourable contract for the Owners which they would have made strenuous efforts to perform if it were commercially possible for them to do so.

(b)   For the 5th & 6th shipments in 2009 and for the shipments in 2010, Glory Wealth repeatedly pressed Flame to declare laycans.  It seems to us very unlikely that Glory Wealth would have persisted in that course of action if, had Flame responded by declaring laycans, those responsible at Glory Wealth knew that Glory Wealth would have been unable to perform by nominating a vessel, and that Glory Wealth would thereby be in default of their obligations.  Put the other way, it seem likely that they would have repeatedly pressed Flame to declare laycans only if they were confident that they would be able to perform in the event that Flame did so.

(c)   Gray Page reported that Glory Wealth remained active and continued "faultlessly" to perform at least one other contract of affreightment – with Fortescue Metals.

(d)   As Flame accepted in their submissions, the nomination of a vessel on voyage charter would be a compliant nomination.  Glory Wealth's ability to perform by taking vessels on voyage charter was demonstrated by the cargoes carried by the La Jolla and the Ocean Crystal and there is evidence to suggest they would have been able to do that again.

45

(e)  If necessary and/or desirable in circumstances in which their financial difficulties were well-known, Glory Wealth had the option to transfer performance to another party, invoking clause 25.

98.     Looking at all the evidence, we have concluded, and find and hold accordingly, that if (contrary to our decision, above) it had been necessary on the balance of probabilities for the Owners to satisfy us that (had the Charterers declared laycans for the 5th and 6th shipments in 2009 and the 6 shipments in 2010) the Owners would have been able to fulfil their obligations under the COA, we would have decided that they would have been able to fulfil those obligations.

**Interest**

99.     So far as we felt it appropriate, we have adopted a broad brush approach.  For the Owners' damages in respect of the 5th & 6th shipments in 2009, which we have calculated were US$1,381,384,60, we have awarded interest from 1st February 2010.  For the damages arising out of the 6 shipments in 2010, which we have calculated were US$4,045,224.00, we have awarded interest from 1st August 2010.  We have awarded it at what we consider is a commercial rate and, as is now common in London arbitrations, we have awarded compound interest.

**Costs**

100.    We have reserved all questions as to the liability for and amount of the parties' costs of the reference and as to the liability for our costs of this award.

46